[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-13921
_____

D. C. Docket No. 5:09-cv-450-WTH-TBS

FRED ANDERSON, JR.

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 12, 2014)

Before TJOFLAT, MARTIN, and DUBINA, Circuit Judges.

TJOFLAT, Circuit Judge:

Fred Anderson Jr. is a Florida death-row inmate awaiting execution for capital murder.  The crime occurred on March 20, 1999, while Anderson was robbing a bank in Mount Dora, Florida.  The only bank employees on duty at the time were two tellers.  Anderson, using two handguns, shot them both.  One of the tellers died at the scene, and the other survived.  At his trial in Lake County, the jury convicted Anderson of capital murder,[1] attempted first degree murder,[2] robbery with a firearm,[3] and grand theft of a firearm.[4]  The jury unanimously recommended that Anderson be sentenced to death for the murder, and the trial judge, accepting the jury's recommendation, sentenced him accordingly.

Anderson seeks a writ of habeas corpus on the ground that his attorneys denied him his right to the effective assistance of counsel in the penalty phase of his case, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.[5]  Specifically, Anderson argues that his attorneys, in preparing for the penalty phase, failed to conduct a reasonable investigation into mitigating evidence and, as a result, failed to discover and present to the jury the mitigating evidence a

---

[1] Fla. Stat. § 782.04(1)(a).

[2] Id. §§ 782.04(1)(a), 777.04(1), 775.087.

[3] Id. § 812.13(2)(a).

[4] Id. § 8.12.14(1), (2)(c)(5).  Anderson was also charged with burglary of a structure, pursuant to § 810.02(1), (4), but the court dismissed the charge during trial.

[5] The Sixth Amendment provides, in relevant part, that "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The Sixth Amendment applies to the states under the Due Process Clause of the Fourteenth Amendment.  See Gideon v. Wainwright, 372 U.S. 335, 345, 83 S. Ct. 792, 797 (1963).

reasonable investigation would have disclosed.  He claims that, but for such failure, there is a substantial probability that he would not have received a death sentence.  The United States District Court for the Middle District of Florida, agreeing with the Supreme Court of Florida that Anderson's claim lacked merit, denied his application for a writ of habeas corpus.[6]  We affirm the District Court's ruling.

## I.

## A.

The circumstances that led to Anderson's arrest and conviction for capital murder go back to 1986, when, at age eighteen, he entered Bethune-Cookman University in Daytona Beach, Florida, hoping to obtain a degree in psychology. His academic performance was poor; after his first semester, his grades started dropping, and by 1990 they were falling precipitously.

In addition to struggling academically, Anderson began to find himself in trouble with the law.  In December 1991, Anderson was convicted of passing a worthless check in the County Court of Volusia County,[7] fined $85, and placed on

---

[6] In denying the writ, the District Court, pursuant to 28 U.S.C. § 2253(c)(1), granted Anderson a certificate of appealability to appeal his claim that Florida's death penalty statute is unconstitutional in light of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).  Anderson now concedes that Evans v. Secretary, Florida Department of Corrections, 699 F.3d 1249 (11th Cir. 2012), which we decided after he took this appeal, forecloses that claim.

[7] Daytona Beach is located in Volusia County, Florida.

probation for three months.  In March 1992, his probation officer reported to the court that Anderson had violated the conditions of his probation and requested that a warrant be issued for his arrest.  A warrant issued, and following a hearing held in April 1994, the County Court sentenced Anderson to jail for seventeen days.[8]  Less than two months after he was released, he was convicted in the County Court on twenty-one counts of passing worthless checks, totaling $1,135.61, to Walmart, Home Depot, Walgreens, and other stores, and was ordered to pay restitution and placed on one years' probation.

## B.

At some point prior to these convictions, Anderson got a job working for Bethune-Cookman University's admissions office.  While serving in this position, Anderson embezzled the tuition payments of two incoming students—amounting to $4,750.  Upon discovering this embezzlement, the University reported Anderson's actions to the State Attorney who filed an information in the Volusia County Circuit Court, charging Anderson with grand theft, a third degree felony.  Anderson pled not guilty and stood trial.  A jury found him guilty as charged, and, in September 1994, the Circuit Court sentenced him to five years' probation, a condition of which required that he make restitution to the University for its loss.  Anderson failed to comply with the payment schedule required by this condition,

---

[8] The record contains no explanation for the court's two-year delay in acting on the warrant.

4

however, and on April 1, 1997, the Circuit Court revoked his probation and placed him under Community Control—a form of in-house arrest—under the supervision of a Volusia County probation officer.[9]

Anderson obtained the court's permission to serve the house arrest at the residence of his mother, Geneva Anderson, in Umatilla, Florida. As a consequence, his supervision was transferred to the Lake County probation office and to probation officer Kathy Carver. Under the conditions of Anderson's Community Control, he was required to continue making restitution payments to Bethune-Cookman. Pursuant to this requirement, Anderson was permitted to work outside of his mother's residence in jobs of which Carver approved. Otherwise, Anderson was restricted to his mother's residence.

Anderson failed to comply with the conditions of his Community Control when he failed to make the scheduled restitution payments or to stay in his mother's residence when he was not working. On May 20, 1998, Carver reported

---

[9] According to the Florida Department of Corrections:

Community Control is a form of intensive supervised house arrest in the community, including surveillance on weekends and holidays, administered by officers with limited caseloads. It is an individualized program in which the freedom of the offender is restricted within the community, home or non-institutional residential placement, and specified sanctions are imposed and enforced. As with probation, violation of any community control condition may result in revocation by the court and imposition of any sentence which it might have imposed before placing the offender on community control supervision. Many of the offenders who are placed on community control are prison diversions.

Florida Department of Corrections, Annual Report 1997–1998, available at http://www.dc.state.fl.us/pub/annual/9798/stats/stat_cs.html.

5

Anderson's non-compliance to the Lake County Circuit Court, requested the revocation of his Community Control, and recommended that Anderson be committed to the Probation and Restitution Center ("PRC") in Pine Hills[10] or sentenced to jail for eleven months and twenty-nine days. Anderson and his attorney received a copy of Carver's report and recommendation, and the court scheduled a revocation hearing. The hearing was continued at Anderson's request, and rescheduled for January 6, 1999. That hearing was again delayed at Anderson's request and was rescheduled for Monday, March 15, 1999.[11]

The hearing was held as scheduled on March 15, and Anderson appeared with counsel. After Carver testified to Anderson's non-compliance with the conditions of Community Control, the Circuit Court ordered Anderson placed under Community Control for 529 days, one year to be served at the PRC beginning the following Friday, March 19. The court's actions operated to terminate Carver's supervision; Anderson would thereafter be supervised by a Volusia County probation officer, Deborah Laso.

Because Anderson was under travel restrictions and thus not authorized to travel to the PRC, he needed a travel permit. Carver instructed him to meet her at her office in Tavares the next morning, March 16, to pick up such a permit. When

---

[10] Pine Hills is a suburb of Orlando, Florida.

[11] The record does not indicate the date of the first revocation hearing. Carver testified, in substance, that the two hearings were continued because Anderson and his attorney were having difficulty coordinating.

6

the two met as scheduled, Carver gave Anderson a travel permit and instructed him to report to the PRC on Friday, March 19 by 4:00 p.m.

C.

On Thursday March 18, Anderson left his mother's residence and went to the residence of a friend, Kerry Cunningham, intending to steal a .22 caliber revolver that Cunningham kept in a locked shed behind his residence. Cunningham was not there, but his brother-in-law was. Under the pretense of wanting to use the telephone, which was in the shed, Anderson convinced Cunningham's brother-in-law to let him into the shed and leave him alone. Once alone, Anderson stole the revolver. Later in the day, Anderson went to the Mount Dora branch of the United Southern Bank (the "USB") and spoke with Johnnie Scott, a loan secretary he knew from church, who sang with him in the choir. Anderson told Scott that he was organizing a youth choir and asked if she would like to join him. He did not mention having to relocate to the PRC the following day.

On Friday morning, March 19, Anderson went to Carver's office, arriving around 10:30 a.m. Carver was not there, but Anderson spoke with another probation officer who was available. Anderson told this officer that he had been ordered to report to the PRC by 4:00 p.m. that day for failing to make restitution to Bethune-Cookman University for funds he had embezzled and that he now had the

7

money necessary to satisfy the obligation. Since he was going to pay the University the sums due, he wondered whether it would still be necessary to report to the PRC. The officer told him to report as ordered.

Later that morning, sometime between 11:00 a.m. and noon, Anderson went to the USB branch in Mount Dora. Two tellers—Marisha Scott and Lori Weed— were on duty. Anderson approached Weed and introduced himself as a student at Valencia Community College.[12] He said that he was interviewing bank officers as part of a research assignment on banking and financial operations. Scott, the head teller, told Anderson that if he would be willing to wait, he could speak with the bank manager, Allen Seabrook. Twenty minutes later, Seabrook invited Anderson into his office where the two conversed for ten to fifteen minutes. Their conversation focused primarily on how a depositor opens and maintains a bank account. Seabrook noticed that whenever he took his eyes off of Anderson to glance at the lobby, Anderson's focus shifted to the surveillance VCR on Seabrook's desk. Other than this apparent fixation with the VCR, however, Seabrook thought that Anderson behaved quite normally.

Following his trip to the USB in Mount Dora, Anderson went to the Colonial Bank in Umatilla. He told the attendant who greeted him that he wanted to open a

---

[12] Valencia College is located in Orlando, Florida. The head of admissions for the college testified at Anderson's trial that Anderson had never been enrolled as a student.

bank account. The officer he needed to see was busy, so the attendant asked Anderson to return on Monday.

At 2:30 on Friday afternoon, Anderson called Deborah Laso in Daytona Beach. He told her that he had the money necessary to satisfy his restitution obligation to Bethune-Cookman and asked how he should go about making the payment. Laso told Anderson that he would have to speak to Kathy Carver about it; in any event, he needed to report to the PRC by 4:00 p.m. as ordered. Anderson failed to report to the PRC, however, and instead went back to his mother's house.

On Saturday morning, March 20, while his mother was out of the house grocery shopping, Anderson removed a loaded .22 caliber revolver from her dresser. When she returned, he asked to borrow her car to go to the store.[13] Armed with her revolver and the revolver he had stolen from Cunningham's shed, he drove to the USB branch in Mount Dora. On the way he stopped by the Walmart and purchased orange juice and a package of donuts.

Anderson arrived at the bank at about 10:15 a.m. The only personnel on duty were two tellers—Heather Young and Marisha Scott. Anderson gave them the orange juice and donuts he had purchased, saying that they were tokens of appreciation for arranging his meeting with Seabrook the previous day. He then

---

[13] Anderson's mother was using a neighbor's automobile. Anderson did not possess a valid driver's license; his license had been suspended. He did not own or have possession of an automobile. The record does not indicate how he transported himself to and from the various locations indicated in the text.

asked Scott if she would explain the job duties of a bank teller, claiming that he needed the information to complete his research assignment. Scott agreed, and Anderson spoke with her for about an hour and a half, until there were no customers in the bank.

At around 11:45 a.m., about fifteen minutes before the bank was set to close, Anderson told the two tellers that he was going to his car to get a business card to give to them. The tellers found this odd, and Scott decided to lock the front door while Anderson was outside. Before she could reach the door, however, Anderson reentered the bank. Once inside the bank, he pointed one of the revolvers he was carrying at Scott and ordered her to go to the vault without setting off any alarms. Young, standing at her teller's station, observed this and apparently froze in fear.

Two doors inside the vault had to be unlocked before the bank's cash locker could be accessed, so Scott went behind the tellers' stations and retrieved the keys to the doors. As she was doing this, Anderson warned her again not to set off any alarms. After retrieving the keys, Scott unlocked the doors, and Anderson took her and Young to the cash locker. The tellers opened the locker using their assigned combinations. Anderson then ordered them to remove the liner bag from the trashcan located in the vault and fill the bag with money. They complied: They cleaned out the $71,618 contained in the top half of the cash locker, placed the

10

money in the bag, and gave the bag to Anderson. At this point, Anderson asked the tellers who wanted to die first. Scott begged him not to hurt them.

At approximately 11:50 a.m., ten minutes before the bank was scheduled to close, Sherry Howard arrived at the bank with her two children. After entering, she noticed that the bank was "unusually dark" and that no one was in the lobby. She heard a woman's voice, coming from the direction of the vault, saying "Please don't. Please no." Howard recognized the voice as belonging to Scott, with whom she had worked for three years at the Eustis branch of the USB. Turning toward the vault, Howard saw what appeared to be a heavily built black man standing just inside the vault doorway. His back was facing away from Howard, and his arms were extended. Howard heard a woman's scream and two or three gunshots. She immediately grabbed her children, left the bank, and ran to a nearby grocery store to call the police.

Anderson fired ten shots[14] at point blank range at Scott and Young. Seven of the shots struck Young; two struck Scott. Anderson put the revolvers in the trashcan liner bag and went to Seabrook's office. There, he tried to eject the surveillance tape from the VCR on Seabrook's desk, but a security feature of the VCR prevented him from doing so. Frustrated, he ripped the VCR from its mount and attempted to pull its cord from the wall. As he was doing this, the bag he was

---

[14] Four shots were fired from his mother's revolver and six shots were fired from Cunningham's.

11

holding ripped open, spilling the money and the two revolvers onto the office floor. Anderson retrieved all of the money and his mother's revolver,[15] which he placed in a nearby trashcan. At this point, he heard moaning sounds coming from the vault. He went there and was surprised to find the two tellers still alive.[16]

A 911 call to the police brought a quick response; two officers arrived at the scene in less than two minutes. They entered the bank with weapons drawn and observed Anderson holding the VCR and the trashcan containing the money and his mother's revolver. The officers ordered him to drop everything. Anderson complied, identifying himself as the bank janitor and asking the officers not to shoot. The officers handcuffed Anderson and searched the building for accomplices. As other officers entered the bank to assist in securing the area, Anderson spontaneously volunteered to one of them "I did it. I did it by myself. I'm by myself."

---

[15] Cunningham's revolver had slipped under Seabrook's desk, and Anderson did not retrieve it.

[16] The record is not clear as to what Anderson did when he found the women still alive. Scott testified that sometime after she was shot, she saw a large black object coming towards her face. Both victims had head wounds. The State claimed that the most likely cause of the wounds was that Anderson, after returning to the vault and realizing that the tellers were alive, struck them with the VCR or some other large object. The VCR was dented, but it was unclear how the dent got there. Anderson told the jury that after he reentered the vault and saw blood coming from Scott's neck, he dropped the VCR.

Paramedics arrived and attended to the two victims. Young was the more severely injured of the two.[17]  Despite the best efforts of the paramedics on the scene,[18] she died on the way to the local hospital.  Scott suffered only two gunshot wounds, but her injuries were catastrophic.  One of the bullets had entered her neck and struck her spinal cord, leaving her paralyzed and with a severely limited ability to intake oxygen.  Through extraordinary efforts the paramedics were able to keep Scott alive as she was evacuated from the bank and transported by helicopter to a hospital in Orlando.[19]

---

[17] The medical examiner testified that each of seven gunshot wounds Young sustained could have killed her except for the wound caused by a bullet that went through her chin and out her right eye.  One of the wounds had a pattern of gunpowder "tattooing" around it, which indicated that the shot was fired no farther than ten inches or so away.

[18] Through an initial survey of the victims' conditions, the paramedics determined that Young had the most severe injuries with several shots to the head and two shots to the torso. Above her right eye was a massive spot of damage, and she was convulsing, which indicated a severe head injury.  At this point she was completely unable to communicate with the paramedics and gave absolutely no indication that she was aware of their presence.  She had a very faint and weak carotid pulse, and the paramedics could not register a reading of blood pressure.  In an attempt to funnel as much blood and oxygen as possible to the heart and the brain, the EMTs suspended Young's feet about a foot off the ground and ventilated her with a bag valve mask.  Despite these efforts Young "coded"—went into complete cardiac arrest—and the paramedics began administering CPR.  Shortly after Young coded—about 25 minutes after the EMT's began administering care—an ambulance team arrived on the scene and assumed control of Young's care.  These paramedics attached Young to a cardiac monitor and attempted to restart her heart through the use of a drug called atropine sulphate and a drug called epinephrine, commonly known as adrenaline.  Although they were initially successful in restarting Young's heart, she quickly slipped back into cardiac arrest.

[19] In an effort to manage Scott's breathing airway, a bag valve mask was placed on her face to breathe for her.  Given the severity of her injuries, however, it quickly became apparent to the paramedics on the scene that endotracheal intubation was necessary.  This required them feed a tube through Scott's mouth, down her throat, and into her lungs.  Given Scott's condition, they had to do a surgical cricthyrotomy—a vertical incision into Scott's neck and through her windpipe to allow the insertion of the tube into her lungs.  This allowed the paramedics to supply Scott with oxygen until the evacuation helicopter arrived.

13

Anderson was taken from the bank to the nearby police station. The police questioned him there, and he confessed to committing the robbery and shooting the tellers.[20]

## II.

On March 21, 1999, the day following his arrest, Anderson appeared in the Lake County Circuit Court, was advised of his rights, and, being indigent, requested the appointment of counsel. The court appointed the Office of the Public Defender for the Fifth Judicial Circuit of Florida.[21] Two Assistant Public Defenders were placed in charge of Anderson's case—William Stone and Clinton Doud.[22] Stone served as Anderson's lead counsel, and Doud served as second chair.

---

While in the helicopter, however, Scott again began to suffer from lack of oxygen. Her color faded from pink back into a bluish cyanotic state, and she slipped into unconsciousness. The paramedics on board were having difficulty getting oxygen into her lungs due to a buildup of pressure in the chest, known as pneumothorax. Through a procedure known as needle thoracentesis—whereby a needle is inserted into the chest above one of the ribs to relieve pressure from the lungs and chest cavity—the paramedics were able to revive Scott en route to the hospital.

[20] In his initial responses to the questioning, Anderson stated that he went to the bank to look at the bank's brochures and see what services it had to offer, that he did not know why he had two guns in his possession, that he did not enter the manager's office to get the VCR, and that the reason the VCR cord was ripped from the wall socket was because he tripped on it.

[21] The Fifth Judicial Circuit includes Lake County.

[22] Originally, Assistant Public Defender Michael McDermott was assigned to Anderson's case along with Stone, but he was replaced by Doud in August or September 1999.

14

Nine days later, on March 30, Anderson was indicted and charged with the capital murder of Heather Young, attempted murder of Marisha Scott, armed robbery of the USB, and grand theft of Cunningham's firearm. He was arraigned on April 1 and entered pleas of not guilty.

The evidence against Anderson was overwhelming. The bank's security cameras had recorded the robbery, the police had caught Anderson red-handed, and Anderson had confessed to both the robbery and the shooting.[23] It was therefore obvious to Stone and Doud that Anderson would be found guilty as charged. The best they could hope for would be a sentence of life imprisonment for Heather Young's murder.

## A.

As the starting point in the defense team's effort obtain information that would persuade a jury not to recommend the death penalty, Stone had Anderson answer a battery of questions posed in a questionnaire styled "Confidential Forensic Assessment" (the "Questionnaire"). The questions focused on the defendant's background and were wide-ranging. Among many areas, the questions

---

[23] Additionally, Anderson's hands tested positive for gunshot residue, and blood on his clothes tested positive for Scott's DNA. A weapons expert also testified that four of the .22 caliber bullets found at the scene matched the revolver Anderson stole from his mother, and although not a perfect match, six of the .22 caliber bullets were consistent with the revolver that Anderson took from Cunningham's shed.

inquired into the defendant's family, childhood, history of abuse, education, employment, drug use, incidents of physical trauma, and mental health history.

The investigator from the Public Defender's Office assigned to Anderson's case, J.T. Williams, delivered the Questionnaire to Anderson and asked that he complete it and return it to Stone. Anderson did as instructed, answering every question. State Court—Collateral Appeal Record, vol. 7, at 1098–1154. His answers to some questions were too long to fit in the space provided, so he attached several additional pages of information to the Questionnaire. Both Stone and Doud felt that Anderson's answers to the Questionnaire were more comprehensive and thorough than any they had ever received in a capital case.

On the Questionnaire, Anderson denied any history of child abuse. Asked to "describe sexual behavior among family members," Anderson answered "None." Id. at 1102. Asked if he thought he was abused or neglected as a child, Anderson answered "No," id. at 1102, and in another section listed that he was sixteen before he became sexually active, id. at 1116. In a section asking him to underline any problems experienced during his childhood, Anderson did not underline "Sexually Molested," "Traumatic Event," or "Witness to Violence," although he did underline "Extreme Fears," "Accident Prone," and "Sick a Lot." Id. at 1130.

Actually, Anderson's answers to the Questionnaire painted a relatively rosy picture of his childhood. Asked to describe his home environment as a child, he

16

answered that he always received "suppor[t]" from his parents and that "[t]here was never a question of love." Id. at 1102. Asked for a summary of his family life as a child he answered that he "had a normal childhood" and that "[he] wasn't an abused child." Id. at 1106.

In one section, Anderson was asked to list the deaths of any close relatives or friends. Id. at 1104. Among the six people Anderson listed was Michael Green whom Anderson described as a cousin who had died from a brain tumor. Id. The Questionnaire also asked him to describe the effect the listed deaths may have had on him. In an attached sheet, he gave a description of how the deaths of the other five friends and relatives he had listed affected him. Id. at 1146–47. He made no reference to Michael Green in the attached sheet.

The Questionnaire did not reveal an extensive problem with drugs and alcohol. Asked if he consumed alcoholic beverages, Anderson answered "yes, in the past" and that he did not consider himself an alcoholic. Id. at 1134–35. Asked if he "use[d] drugs or ha[d] . . . in the past," Anderson answered "Yes" and underlined "in the past." Id. at 1136. When asked for the history of his use, Anderson answered "Marijuana—occasionally." Id.

Finally, the Questionnaire disclosed no evidence of head trauma. Asked to list "all hospitalizations for mental disturbance, neurological problems and head injuries" Anderson answered "None." Id. at 1126. He also answered "None"

17

when asked to list all outpatient contacts for the same.  Id.  Asked if he "ever suffered hallucinations, blackouts, flashbacks or other adverse effects," Anderson answered "No."  Id. at 1136.

Stone evaluated Anderson's answers to the questions posed outside of Anderson's presence.  Stone met with Anderson several times, and at no point during those meetings did Anderson divulge any information about a history of sexual abuse, drug use, or head trauma that differed from, or was inconsistent with, what he disclosed in completing the Questionnaire.

About three weeks prior to the commencement of Anderson's trial, Stone moved the court to appoint Dr. Elizabeth McMahon to evaluate Anderson.[24]  The court granted his motion.  Dr. McMahon was a forensic psychologist with over thirty years of experience, including involvement in the penalty phase in more than 100 capital murder cases.  Stone briefed Dr. McMahon on Anderson's case, asking her to evaluate Anderson with an eye toward developing mitigating evidence.

Dr. McMahon met with Anderson on four occasions amounting to a total of about thirteen hours.  During this time she conducted a full neuropsychological screening, which included the sessions with Anderson and the results of a

---

[24] Stone deliberately delayed having Dr. McMahon appointed until he had assembled all the background information he anticipated she would need to perform her evaluation.  Among other things, Dr. McMahon would need a transcript of Marisha Scott's deposition, which, due to the severity of Scott's injuries, could not be taken until two and one-half weeks prior to the trial.

comprehensive battery of psychological tests.[25]  In the sessions with Anderson, and in an effort to obtain evidence to counter the State's claim that Heather Young's murder was premeditated, Dr. McMahon tried to get Anderson to remember anything that might have precipitated the shooting.   He told her that he could recall the shooting, but not why the guns went off.  Based on her sessions with Anderson and the results of the tests she had administered, Dr. McMahon concluded that Anderson was suffering from a great deal of anxiety which could be causing his memory loss.  On her recommendation, Stone obtained the court appointment of Dr. Jacqueline Whitmore, a psychologist specializing in hypnotism, in the hope that, under hypnosis, Anderson would reveal further details about what took place after he ordered the tellers into the bank's vault.  Anderson was hypnotized but revealed nothing more than what he had told his attorneys and Dr. McMahon.

In addition to meeting with Anderson and administering a battery of psychological tests, Dr. McMahon reviewed, among other items, "discovery material compiled by the State, statements made by the defendant to the police, depositions of Category 'A' witnesses (including a videotape of [Scott's]

---

[25] McMahon administered the following tests on September 6 and 8, 2000: Wechsler Adult Intelligence Scale-Revised (WAIS-R), Wisconsin Card Sorting Test, Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Rorschach Ink Blot, Memory Assessment Scales, Stroop Color Word Test, Trail Making Tests A and B, Personality Disorder Questionnaire-Revised, Projective Drawings Test, Hand Test, Competency Assessment, and a Miranda Rights Assessment.  State Court—Collateral Appeal Record, vol. 7, at 1034.

deposition), school records, and letters written and received by the defendant since his arrest." State Court—Collateral Appeal Record, vol. 7, at 1034. Based on this information, Dr. McMahon concluded that there was no evidence of anything "that would serve as either statutory or non-statutory mitigation factors before the Court with respect to sentencing."[26] Id. at 1035.

Based on Dr. McMahon's report and Anderson's answers on the Questionnaire, Anderson's attorneys finalized their trial strategy. They decided not to attack the overwhelming evidence of guilt the State would be introducing, reasoning that such a strategy would be ineffective if not counterproductive. Instead, their plan of attack would be to "humanize" Anderson. They would use the guilt phase of the trial as an "extension" of the penalty phase, and in both phases would do their best to portray Anderson in a way that would generate the maximum amount of sympathy for him and hopefully persuade the jury not to recommend a death sentence. Stone thought that a life sentence may be possible if he and Doud could convince the jury that the murder was not premeditated.[27] Counsel decided against presenting evidence of Anderson's occasional use of

---

[26] Dr. McMahon's report to Stone was dated October 10, 2000. Dr. McMahon gave Stone a verbal report with precisely the same information earlier, prior to the commencement of Anderson's trial.

[27] Stone thought that a jury finding that Anderson never intended a murder to occur would eliminate the aggravating circumstance that the murder "was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." See Fla. Stat. § 921.141(5)(i).

alcohol and marijuana in the past as potential mitigation, believing that such evidence would likely be more harmful than helpful.

### B.

The trial began on September 25, 2000. In the guilt phase, the State established the general narrative recited above. The only witness to testify for the defense was Anderson himself. In his testimony, Anderson admitted committing the robbery and shooting the tellers. He explained that he had gone to the bank planning to steal the money he needed to take care of his mother, a disabled cancer survivor, but that shooting the tellers was not part of his plan. He remembered taking the tellers to the bank's vault and firing three shots, but he said the gun went off accidentally.[28] He denied asking the tellers which one wanted to die first.

On cross-examination, the State demonstrated that Anderson had a clear recollection of many events that took place in the vault. He remembered ordering the tellers to get the liner bag out of the trashcan, and he recalled where the two tellers were positioned in the vault before he fired the shots. He also remembered firing three shots, not ten, and repeated what he had said on direct examination: that the gun went off by accident. When asked why the details were "blanking out

---

[28] On cross-examination, in order to undercut Anderson's assertion that the shooting was accidental, counsel for the State emphasized that in firing Cunningham's revolver, one had to pull back the hammer before each shot and that his mother's revolver had trigger pull of seventeen and one-half pounds.

21

on him," Anderson responded that "[i]t's not blanking out, it's just been how it's been for eighteen months." State Court—Trial Transcript, vol. 16, at 2140.

On October 3, 2000, the jury convicted Anderson of the first-degree murder of Heather Young, the attempted murder of Marisha Scott, armed bank robbery of the USB, and grand theft of Cunningham's revolver

The penalty phase of the trial began on October 5, 2000, and lasted one day. Anderson's defense team went to great lengths to find witnesses who could present mitigating testimony. First, Anderson and his mother separately prepared a list of potential witnesses. Stone and Doud, with the help of their investigator, Williams, attempted to contact and interview every person on these lists. Some of these interviews provided leads to other potential witnesses, who were then contacted and interviewed. The defense team also spent time in Anderson's neighborhood trying to identify witnesses that neither Anderson nor his mother had mentioned. Some of the potential witnesses they interviewed were reluctant to get involved; at least four, including the pastor of Anderson's church, simply refused to testify. Counsel decided not to call anyone they thought might prejudice Anderson's case.

The State's case in the penalty phase was brief. The State began by informing the jury that it was seeking a death sentence recommendation based on four aggravating circumstances: (1) Heather Young's murder was cold, calculated

22

and premeditated;[29] (2) the murder was committed for pecuniary gain;[30] (3) Anderson committed the murder after having been convicted of a felony and while under Community Control;[31] and (4) he had been convicted of a violent felony—the attempted murder of Marisha Scott.[32]

After pointing to the evidence presented in the guilt phase, which the State said established the aggravating circumstances it was relying upon, the State called two witnesses, Heather Young's long-time boyfriend, David Curbow,[33] and her brother Robert Young. Both testified to Young's upbeat nature and zest for life.

The defense's case consisted of the testimony of ten witnesses including Anderson. The witnesses, mostly family friends, testified that they had known Anderson for lengthy periods of time and that he was a church-going, helpful member of the community who often came to a person's aid without being asked and without compensation. One of Anderson's former employers testified that he had been a model employee. Anderson's mother testified that he was a wonderful child who had helped her immensely as her health declined. He was never abused

---

[29] Fla. Stat. § 921.141(5)(i).

[30] Id. § 921.141(5)(f).

[31] Id. § 921.141(5)(a).

[32] Id. § 921(5)(b). Although the attempted murder of Marisha Scott was part of the same robbery as the murder of Heather Young, "[c]ontemporaneous convictions prior to sentencing can qualify as previous convictions of violent felony and may be used as aggravating factors." Wasko v. State, 505 So. 2d 1314, 1317 (Fla. 1987).

[33] Young's boyfriend, David Curbow, testified that while he and Young were not married, they considered themselves to be husband and wife.

23

as a child and was never quick to anger.  Anderson testified about his high school

extracurricular activities and his extensive involvement with his church, including

performing a leadership role in numerous youth group events.

The penalty phase of the case concluded with a unanimous jury

recommendation that Anderson receive the death penalty.[34]

On January 11, 2001, the court, following the jury's recommendation,

sentenced Anderson to death.  The court found the four aggravating circumstances

the State had asked the jury to find, assigning varying degrees of importance or

"weight" to each: (1) that the capital felony, Heather Young's murder, was a

homicide and was committed in a cold, calculated, and premeditated manner

without any pretense of moral or legal justification (great weight); (2) that the

capital felony was committed for pecuniary gain (moderate weight); (3) that the

capital felony was committed by a person previously convicted of a felony and

under sentence of imprisonment or placed on Community Control or on felony

---

[34] Pursuant to Fla. Stat. § 921.141(2), the jury was tasked with the following responsibility:

> After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
> (a) Whether sufficient aggravating circumstances exist . . .
> (b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and
> (c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

The court instructed the jury that in order to recommend the imposition of a death sentence, it had to find the existence of at least one aggravating factor beyond a reasonable doubt.

24

probation (little weight); and (4) that that the defendant was convicted of a previous violent felony, the attempted murder of Marisha Scott (great weight).

The court found no statutory mitigating circumstances,[35] and ten non-statutory mitigating circumstances, again assigning a separate degree of importance or weight to each.[36] After sentencing Anderson to death for the capital murder, the court sentenced him to life imprisonment for the attempted murder of Marisha Scott, life imprisonment for robbing the bank with a firearm, and five years' imprisonment for the grand theft of Cunningham's revolver.

---

[35] Under Fla. Stat. § 921.141(6),

Mitigating circumstances [are]:
(a) The defendant has no significant history of prior criminal activity.
(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
(c) The victim was a participant in the defendant's conduct or consented to the act.
(d) The defendant was an accomplice in the capital felony committed by another person and his or her participation was relatively minor.
(e) The defendant acted under extreme duress or under the substantial domination of another person.
(f) The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired.
(g) The age of the defendant at the time of the crime.
(h) The existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty.

[36] The 10 non-statutory mitigating circumstances were (1) remorse for conduct (moderate weight); (2) cooperation with law enforcement (some weight); (3) strong religious faith and involvement in church activities (substantial weight); (4) strong community involvement (moderate weight); (5) loving relationship with family (little weight); (6) employment history (little weight); (7) potential for rehabilitation (little weight); (8) no prior history of violence (substantial weight); (9) appropriate courtroom demeanor (little weight); and (10) willingness to plead (little weight).

25

C.

Anderson appealed his convictions and death sentence to the Florida Supreme Court, seeking a new trial or alternatively the imposition of a sentence of life imprisonment for the murder.[37]  The Supreme Court rejected claims of error and affirmed his convictions and death sentence.  Anderson v. State, 863 So. 2d 169 (Fla. 2003).  Referring to the sentence, the court "specifically not[ed] that the jury recommended the death sentence by a unanimous vote and one of the aggravating factors found by the trial judge was that Anderson had been convicted of a prior violent felony for the contemporaneous conviction of the attempted murder of Scott."  Id. at 189.  Anderson sought certiorari review of the Florida Supreme Court's decision in the United States Supreme Court, but his petition was denied.  Anderson v. Florida, 541 U.S. 940, 124 S. Ct. 1662, 158 L. Ed. 2d 363 (2004).

III.

Unable to obtain relief for his convictions and death sentence from either the Florida Supreme Court or the United States Supreme Court, Anderson, represented by Capital Collateral Counsel,[38] returned to the Lake County Circuit Court seeking collateral relief pursuant to Florida Rule of Criminal Procedure 3.851.  On March

---

[37] Only one of the issues he raised is before us in this appeal, and we dispose of it summarily in note 6, supra.

[38] Anderson's counsel on collateral attack was David R. Gemmer, Assistant Capital Collateral Regional Counsel.

26

18, 2005, Anderson moved the court[39] to vacate his convictions and death sentence on several grounds including the one before us in this appeal, a claim that he received ineffective assistance of counsel during the penalty phase of his case. Anderson alleged that his attorneys' performance during that phase failed to comport with the Sixth Amendment standard for effective assistance of counsel established by the United States Supreme Court in Strickland v. Washington and that this failure prejudiced his defense. 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The attorneys' performance was deficient, Anderson alleged, for two reasons: (1) his attorneys failed to uncover and present to the jury evidence that he was sexually abused as a child by his cousin, Michael Green; and (2) the attorneys failed to discover that he suffered from brain damage, borderline personality disorder, and post-traumatic stress disorder, caused by the sexual abuse. Anderson posited that these failures precluded counsel from establishing two statutory mitigating circumstances: (1) that he was "under the influence of extreme mental or emotional disturbance"; and (2) that his "capacity . . . to appreciate the criminality of his . . . conduct or to conform his . . . conduct to the requirements of law was substantially impaired." Fla. Stat. § 921.141(6)(b), (f). Presenting those mitigating circumstances to the jury, Anderson argued, would

---

[39] Anderson presented his motion to the judge who presided over his prosecution and sentencing.

have made it likely that the outcome of penalty phase of his trial would have been different.

A.

The Circuit Court held an evidentiary hearing on Anderson's motion from January 23 to 25, 2006. Anderson presented evidence that, as a child, he had been the victim of Michael Green's sexual abuse and that the shooting that took place in the USB's vault was caused by his post-traumatic stress disorder, borderline personality disorder, brain damage, and the effects of his chronic drug use. This evidence came in the form of testimony from his cousin, Raymond Green, and two mental health experts, Drs. Jorge Villalba and Robert Berland, whom post-conviction counsel had retained to evaluate Anderson. Anderson also called Dr. Elizabeth McMahon to question her about the evaluation she performed on him prior to trial.[40]

Raymond Green testified that he spent time with Anderson during their childhood since Green's maternal grandmother lived just across the street from the Andersons. On occasion, Anderson would spend the night with Green at his grandmother's home, sleeping with Green in his bedroom.

---

[40] Anderson also called as witnesses Assistant Public Defenders William H. Stone and Clinton L. Doud, Investigator J.T. Williams, and Karen Nelson, the bailiff who worked during his trial. Nelson's testimony has no relevance to the issues here.

Raymond said that Michael Green, his uncle who was eight year older than he was, lived with his grandmother. When Raymond was only five years old, Michael began forcing him to perform oral sex in Michael's bedroom at night. When Anderson was there, Michael would do the same thing to him. According to Raymond, Michael would, on occasion, anally rape Anderson when Anderson was staying in Raymond's room.

Dr. Villalba, a psychiatrist board certified in forensic psychiatry,[41] testified that Anderson suffered from post-traumatic stress disorder as a result of Michael Green's sexual abuse, as well as borderline personality disorder. In Villalba's opinion, Anderson was under the influence of extreme mental and emotional disturbance at the time of the shooting.

Villalba based his opinion on a four-hour session with Anderson, a review of Anderson's videotaped interrogations by the police, and a Personality Assessment Inventory ("PAI").[42] By his estimate, half of his conclusions were based on Anderson's self-reported symptoms and the other half on the results of the PAI.

Dr. Villalba said that Anderson's history of childhood sexual abuse left him with post-traumatic stress disorder which caused him to suffer from dissociative episodes. He described these dissociative episodes as a dream-like state "where

[41] Dr. Villalba had been board certified for one year. Anderson's was the first capital murder case in which he had been involved.

[42] Dr. Villalba testified that a PAI is similar to the MMPI-2 but that he wanted to try a test that had not been given to Anderson in the past.

29

one feel[s] like things are not real." State Court—Collateral Appeal Record, vol. 9, at 1505. Although Dr. Villalba acknowledged that Anderson had taken many deliberate steps in preparation for the robbery, he opined that "the intense level of stress during the actual committing of the robbery would be a precipitating or contributing factor to the dissociation." Id. at 1506. Dr. Villalba also stated that Anderson told him that one of the bank tellers closed the glass vault door on his hand and one of them may have called him a "stupid . . . derogatory racial 'N' word."[43] Id. at 1532. Dr. Villalba postulated that this might have triggered the onset of a post-traumatic stress disorder dissociative episode.

On cross-examination, Dr. Villalba admitted that manipulative behavior was typical for those with borderline personality disorder such as Anderson's and that Anderson had an incentive to make his mental health appear worse than it actually was.

Dr. Berland, a forensic psychologist with twenty-seven years' experience, testified that Anderson suffered from a psychotic disturbance while in the bank's vault such that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

---

[43] When asked on cross-examination whether he had reviewed the trial record for any support for either of these assertions, Dr. Villalba said he had not. In fact, there is no support in the trial record for either assertion. During his testimony in the collateral attack evidentiary hearing, Stone testified that Anderson had never said anything about the tellers calling him stupid or a racial slur even though Stone had directly asked him about provocation looking for evidence of this sort.

Dr. Berland met with Anderson for a total of four hours and administered no tests of his own; he relied, instead, on the tests Dr. McMahon administered when she evaluated Anderson prior to trial.  Based on his time with Anderson and his analysis of Dr. McMahon's test results, Dr. Berland concluded that Anderson had suffered brain injury from a head-on car accident that Anderson said he had been involved in at age twenty-two.  Although Anderson informed Dr. Berland about the accident,[44] he failed to mention it in responding to the Questionnaire inquiries about head injuries.

Anderson told Dr. Berland about mental health problems that he had omitted from the Questionnaire, including that "for a long time [he had] experienced the feeling that people in public places were either watching him or talking about him as he passed" and that he often heard voices calling his name.  Id. at 1558–59.  Based on these self-reported symptoms and his analysis of the tests Dr. McMahon administered,[45] Dr. Berland opined that Anderson suffered from brain damage that

---

[44] Dr. Berland's investigator confirmed Anderson's description of the episode by interviewing the passenger in the car, Marty Kirens.  Dr. Berland thereafter asked Anderson's mother about the accident.  She said that it occurred after Anderson had been admitted to college.  She described that for several days following the accident, Anderson had headaches, nausea and vomiting, and memory problems and that he would stare off into space for long periods of time apparently looking right through her.  She also noted that he would become angry over little things, show symptoms of vision problems, and display a hand tremor that lasted two or three months.  This account stands in contrast to her testimony at trial which portrayed Anderson as always healthy and never quick to anger.

[45] Dr. Berland based his conclusion primarily on the results Dr. McMahon obtained from the MMPI-2 and the WAIS-R she administered to Anderson prior to trial.

31

had "either caused or contributed" to a psychotic disturbance in the bank's vault. Id. at 1563.

Dr. Berland also testified that Anderson had a serious alcohol and marijuana abuse problem. Anderson told Dr. Berland that he was part of a group called the "Breakfast Club" that met every morning, usually at his friend Kerry Cunningham's house, to consume copious amounts of beer and marijuana. Dr. Berland met with Cunningham to ask him about these meetings. Cunningham denied that the Breakfast Club ever existed, claiming that on the rare occasion when the two got together, they merely drank beer. Dr. Berland admitted, on cross-examination by the State, that Anderson had a "pretty strong incentive" to mislead him, and that Anderson had "a substantial history of deceiving and misleading people over the course of his life." Id. at 1618–19.

Anderson called Dr. McMahon to explain the battery of tests she had performed on Anderson prior to trial and the conclusions she had reached. On cross-examination by the State, Dr. McMahon was asked about the conclusions reached by Drs. Villalba and Berland. She stated that, even taking into account the information Anderson provided to Drs. Villalba and Berland but not to her, she saw nothing to suggest that Anderson had brain damage[46] and borderline

---

[46] Dr. McMahon felt that Dr. Berland inappropriately interpreted the results she had obtained from the MMPI-2 that she administered to Anderson. In her opinion, all of the results of that test were within normal limits and only reflected anxiety rather than a psychosis.

32

personality disorder[47] or that his actions at the bank were caused by post-traumatic stress disorder from being sexually abused as a child.[48] Dr. McMahon also testified that, while she had been retained to evaluate Anderson closer to his trial date than is typical, she had adequate time to thoroughly evaluate his mental health.

As part of its rebuttal to Anderson's ineffective assistance of counsel claim, the State called Dr. Harry McClaren,[49] whom the State employed in response to the claims of Anderson's Rule 3.851 motion. Dr. McClaren testified that in preparing for the evidentiary hearing, he conducted an exhaustive investigation into Anderson's mental health. He began by interviewing Anderson twice. He thereafter interviewed several police officers, Anderson's trial attorneys, Anderson's mother, Kerry Cunningham, and Dr. McMahon. In addition, he read

---

[47] Dr. McMahon reasoned that if Anderson suffered from borderline personality disorder, the disorder would have been revealed in the MMPI-2 and WAIS-R tests. Based on her analysis of these tests' results, however, the disorder was not shown. Moreover, nothing in Anderson's Rorschach test results indicated that he had the disorder.

[48] According to Dr. McMahon,

> PTSD . . . occurs when something that's happening in the here and now is reflective of or brings forth memory of what happened in the past. Obviously with people in war time when a car backfires it sounds like a gun firing. There's got to be a similarity. So unless [Anderson] can show me some similarity between being in that bank vault and being molested by his cousin, I've got to say that he may have PTSD, [but there would have to be some showing of] what way . . . being in the bank vault reminded him of some interaction with his cousin for it to be pertinent.

State Court—Collateral Appeal Record, vol. 10, at 1644.

[49] Dr. McClaren had been involved in hundreds of capital cases, working at the behest of both the prosecution and the defense.

33

the transcripts and viewed the videotape of the police interrogations of Anderson.

He also read the transcript of Anderson's trial, the briefs filed in his direct appeal

to the Florida Supreme Court and that court's decision, Anderson's high school

and college records, his medical records, his criminal history records, and Drs.

Villalba's and Berland's reports.  Furthermore, after interviewing Anderson, he

had Anderson take a full battery of psychological tests[50] and analyzed the results of

those tests.

According to Dr. McClaren, nothing in his investigation led him to conclude

that Anderson had brain damage, post-traumatic stress disorder, borderline

personality disorder, or experienced a psychotic episode in the bank's vault.  Dr.

McClaren also suggested that the inconsistencies in Anderson's stories might

reflect an attempt by Anderson to mislead the court.  In making this suggestion, Dr.

McClaren emphasized Anderson's "track record of deception."[51]  Dr. McClaren

---

[50] McClaren prescribed an MMPI-2; a Wechsler Adult Intelligence Scale–Third Edition
(WAIS-3); a Rotter Incomplete Sentences Blank (RISB); and a Millon Clinical Multiaxial
Inventory–Third Edition (MCMI-3).

[51] Dr. McClaren explained that this "track record" included Anderson's embezzlement
from Bethune-Cookman, his history of writing bad checks, his misrepresentations to his mother
about graduating from college and his legal problems in Volusia county, his denying a history
sex abuse in responding to the Questionnaire, his inconsistent statements to the different mental
health professionals who evaluated him, his claim at the USB that he was a student at Valencia
Community College, his representations to the probation officers that he had obtained the
balance of  the restitution he owed Bethune-Cookman when he had not, his purchase of orange
juice and donuts as a supposed thank you for the bank tellers' time, his representation to the
arresting officers that he was the janitor, the conflict in testimony between Anderson and Kerry
Cunningham about the extent of his substance abuse at the Breakfast Club, and his inconsistent
statements during police interrogation.  State Court—Collateral Appeal Record, vol. 11, at 2024.

also noted that Anderson had strong motivation to remember that he fired only three shots, because if he testified that he remembered all ten, it would mean he consciously used both revolvers, which would indicate an execution-style murder. This motivation, according to Dr. McClaren, may also have been the reason for Anderson's failure to remember asking the tellers "[w]ho wants to die first?"

On cross-examination by collateral counsel, Dr. McClaren acknowledged that he had diagnosed Anderson with an anxiety disorder and that post-traumatic stress disorder was a form of anxiety disorder. He nevertheless maintained that he saw no link or connection between the sexual abuse Anderson had suffered as a child and the shooting he had committed at the bank. When asked about the short interval between Dr. McMahon's appointment (to evaluate Anderson) and the trial, Dr. McClaren stated that although a mental health evaluation normally takes place six months to a year prior to trial, he found nothing in Dr. McMahon's evaluation of Anderson that could be considered incomplete in any way.

### B.

On January 24, 2007, the Circuit Court issued an order denying in full the claims Anderson presented in his Rule 3.851 motion. State v. Anderson, No. 99-572 (Fla. 5th Cir. Ct.). The court found no merit in Anderson's claim that his attorneys' performance in seeking mitigating evidence for presentation to the jury as constitutionally deficient. The court noted the steps the attorneys took in

35

preparing for the penalty phase of the case—emphasizing that (1) they employed a forensic psychologist, Dr. McMahon, to evaluate Anderson's mental health and provide, if possible, an explanation for Anderson's conduct at the bank; and (2) they interviewed the numerous potential witnesses identified in Anderson's response to the Questionnaire and on the lists that he and his mother had prepared. Turning to the attorneys' failure to discover the sexual abuse Anderson experienced at the hands of Michael Green, the court said that counsel "should not [have been] expected to investigate potential incidents of sexual abuse when [Anderson] did not suggest any abuse had occurred and actually concealed the abuse from Counsel and the mental health expert involved in the case."

## C.

Anderson appealed the Circuit Court's decision to the Supreme Court of Florida. Anderson v. State, 18 So. 3d 501 (Fla. 2009). Among the issues he raised was the one we address today: whether he was denied effective assistance of counsel in the penalty phase of his case. As in the Circuit Court, Anderson argued that his attorneys' performance was deficient in two respects: (1) they failed to uncover and present to the jury evidence of the sexual abuse he suffered from Michael Green; and (2) they failed to employ Dr. McMahon in time to uncover and present to the jury the mental health evidence Drs. Villalba and Berland found— namely, that Anderson had brain damage, borderline personality, and post-

36

traumatic stress disorder caused by the sexual abuse. The attorneys would have discovered such evidence, Anderson argued, had they given Dr. McMahon sufficient time and background information to evaluate Anderson.

Addressing Anderson's first point, the Florida Supreme Court found counsel's failure to uncover the sexual abuse understandable and, moreover, excusable, "in large part because Anderson himself was a barrier to the discovery of this evidence." [52] Id. at 509. The court emphasized that the Questionnaire counsel had Anderson fill out was facially quite thorough and that Anderson, in responding to its several questions about sexual abuse, had explicitly denied having suffered any such abuse. In concluding that Anderson had failed to demonstrate Strickland prejudice, the court pointed to the Circuit Court's findings of four aggravating circumstances, including that the murder was cool, calm, and premeditated and that Anderson had been convicted of a prior violent felony, which "are 'among the weightiest of aggravators.'" Id. at 510 (quoting Deparvine v. State, 995 So. 2d 351, 381 (Fla. 2008)). Moreover, the fact that the murder of Heather Young was the result of a bank robbery plan "replete with instances of deception" further supported the jury's decision to recommend the death penalty. Id.

---

[52] In reaching this conclusion, the court pointed to Strickland's language that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." 466 U.S. at 691, 104 S. Ct. at 2066.

Addressing Anderson's second point, the Supreme Court found that his attorneys were not deficient in waiting until three weeks before trial to employ Dr. McMahon and, alternatively, that the alleged delay resulted in no prejudice. Id. at 511–13. The Florida Supreme Court believed that trial counsel's explanation of why they delayed Dr. McMahon's employment was reasonable and that the delay did not prevent Dr. McMahon from performing a competent and thorough evaluation. Dr. McMahon testified during the 3.851 evidentiary hearing that she had sufficient time to perform the task she undertook. Id. at 511 She met with Anderson on four separate occasions, gave him a full neuropsychological screening and battery of tests, and had ample time to evaluate the screening and the test results in conjunction with what she observed in her sessions with Anderson. Id. She found nothing to explain why Anderson shot the tellers. Drs. Villalba and Berland found that the shooting was caused by Anderson's mental deficiencies—a brain damage induced psychotic disturbance, or a dissociative episode caused by post-traumatic stress disorder caused by Michael Green's sexual abuse, or other mental or emotional deficiency. Dr. McMahon disagreed. In the court's mind, "[t]he fact that Anderson has subsequently found experts whose opinions conflict with McMahon's  does not render her evaluation inadequate." Id. at 511–12. "Trial counsel [were] not required to continue searching for an expert who would give a more favorable assessment of Anderson's mental status." Id. at 512.

Assuming, for sake of argument, that counsel's mental health preparation did not measure up to Strickland's performance standard, the Supreme Court concluded that Anderson had not shown Strickland prejudice. The court emphasized that the record of the evidentiary hearing revealed strikingly different expert opinions as to Anderson's mental health at the time he entered the bank and committed the offenses for which he was charged. Id. at 513. "Considering the overwhelming evidence establishing the aggravating circumstances and the inconclusive opinions regarding Anderson's mental health, the court's confidence in the outcome [was] not undermined." Id.

## IV.

On October 14, 2009, Anderson petitioned the United States District Court for the Middle District of Florida for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, presenting seventeen claims for relief. Anderson v. Sec'y, Fla. Dep't of Corr., No. 09-450, 2011 WL 2784192 (M.D. Fla. July 15, 2011). The District Court examined his claims through the lens provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA,") and then denied them.[53] It did so because the Supreme Court of Florida's adjudications of Anderson's claims were neither "contrary to," nor

---

[53] The court denied Anderson's claims without an evidentiary hearing after considering the records of Anderson's trial and Rule 3.851 post-conviction proceeding and the Florida Supreme Court's disposition of his appeals from his convictions and death sentence and from the Circuit Court's denial of Rule 3.851 relief.

"involved an unreasonable application of, clearly established" United States Supreme Court precedent, i.e., the holding in Strickland. Id. at *5.

The District Court found no error in the Supreme Court's rejection of Anderson's claim that his attorneys' performance during the penalty phase of his case failed Strickland's performance test. Id. at *2–4. Like the Supreme Court, the District Court noted that counsel's failure to find out about the Michael Green sexual abuse was caused by Anderson himself, in that he repeatedly denied having suffered any such abuse. Id. at *3. And counsel's employment of Dr. McMahon three weeks prior to trial did not preclude her from conducting a thorough evaluation into whether he had brain damage or a mental illness that might have mitigated his behavior. Id. at *4. The District Court was as impressed as the Florida Supreme Court was with Dr. McMahon's extensive experience and, in particular, with the thoroughness of her evaluation of Anderson, which included conducting sessions with him on multiple occasions, giving him a full battery of psychological tests, reviewing the evidence the State would present to the jury, and seeking a mental health explanation for his behavior at the bank—especially in the vault when the shooting occurred. Id. In the end, the District Court, turning to the Florida Supreme Court's resolution of the Strickland prejudice issue, "reviewed the totality of the mitigation evidence presented at Anderson's trial and at the post-conviction proceedings and agree[d] with the Florida Supreme Court that any

40

mitigating evidence, including any mental health evidence, would not have changed the result in this case." Id.

V.

Anderson now appeals the District Court's decision.  To enable the appeal to go forward, we issued a certificate of appealability on one issue: whether Anderson's attorneys rendered ineffective assistance of counsel during the penalty phase of his case by failing to conduct a reasonable investigation for mitigation evidence and thereby failing to present to the jury the evidence a reasonable investigation would have uncovered.[54]  As the District Court did, we examine this claim and the Florida Supreme Court's decision denying it through AEDPA's lens.

Pursuant to AEDPA, a writ of habeas corpus shall not be granted under 28 U.S.C. § 2254(d) unless the adjudication

---

[54] 28 U.S.C. § 2253 provides, in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court
. . .
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional   right.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta," of the Supreme Court decisions extant at the time of the State court adjudication. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). A State court decision is "contrary to" a Supreme Court holding "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412–13, 120 S. Ct. at 1523. A State court decision involves an unreasonable application of a Supreme Court holding if the State court correctly identifies the holding but unreasonably applies it to the facts of the prisoner's case. Id. at 407, 120 S. Ct. at 1520.

An unreasonable application of a Supreme Court holding is different from an incorrect application of a Supreme Court holding. Harrington v. Richter, __U.S. __, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011). A federal habeas court might consider the State court's application of a Supreme Court holding incorrect were it reviewing the State court's decision as an appellate court on direct appeal, but the

42

habeas court is not conducting such review.  AEDPA, having limited the federal court's authority to grant the writ, precludes the court from issuing the writ even when it "concludes in its independent judgment that the state-court decision applied [the Supreme Court holding] incorrectly."  Woodford v. Visciotti, 537 U.S. 19, 24–25, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002).

Section 2254(d)'s "standard for evaluating state-court rulings" is therefore "highly deferential," id. at 24, 123 S. Ct. at 360 (internal quotation marks omitted), and "difficult to meet."  Harrington, __ U.S. at __, 131 S. Ct. at 786.  It "demands that state-court decisions be given the benefit of the doubt."  Woodford, 537 U.S. at 24, 123 S. Ct. at 360.  To obtain habeas relief, a state prisoner must show that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  Harrington, __ U.S. at __, 131 S. Ct. at 786.  Put another way, the state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id.

The Supreme Court holding governing the disposition of an ineffective assistance claim, such as Anderson's, is found in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To make out a claim, the petitioner must prove that his attorney's performance was deficient.  If deficient, the petitioner must also show that the deficiency prejudiced his defense, in that it

"deprive[d] [him] of a fair trial, a trial whose result is reliable." Id. at 687, 104 S. Ct. at 2064. The District Court concluded that the Florida Supreme Court's decision denying Anderson's ineffective assistance claim was neither contrary to, nor an unreasonable application, of Strickland's holding. Anderson contends that the District Court erred, because the Florida Supreme Court's decision cannot be squared with Strickland's holding as the Supreme Court of the United States has applied the holding in more recent cases.[55]

### A.

In his petition for a writ of habeas corpus, Anderson alleged that the Florida Supreme Court unreasonably applied Strickland based on the United States Supreme Court's application of Strickland in four cases: Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), and Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009). In his brief on appeal, Anderson argues that in addition to the holdings in these four cases, the Florida Supreme Court disregarded the American Bar Association (ABA) Guidelines in effect at the time of Anderson's trial. Pet'r's Br. at 27, 30. He submits that the holdings in the four

---

[55] Because the District Court reached its decision on a cold record—the same record now before this court—we review its decision de novo. Thus, our task, like the District Court's, is to determine whether the Florida Supreme Court misapplied controlling United States Supreme Court precedent. See 28 U.S.C. § 2254(d)(1).

cases and the ABA Guidelines, taken as a whole, demonstrate that his attorneys' performance in the penalty phase was constitutionally deficient.

Notwithstanding this authority, Anderson's claim is simply that the Florida Supreme Court unreasonably applied Strickland. That decision established that a defendant has a right under the Sixth Amendment to an attorney who performs reasonably under "professional norms" prevailing at the time and in the location of the criminal prosecution and in the circumstances of the case. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. Williams, Wiggins, Rompilla, and Porter—which post-date Anderson's trial and involve trials in states other than Florida—do not provide separate standards and rules governing attorney competence; rather, they provide illustrative "application[s] of the principles elucidated in Strickland to a novel set of facts." Newland v. Hall, 527 F.3d 1162, 1197 (11th Cir. 2008); see also Williams, 529 U.S. at 390, 120 S. Ct. at 1511("[T]he merits of [the Williams] claim are squarely governed by our holding in Strickland v. Washington."); Wiggins, 539 U.S. at 522, 123 S. Ct. at 2536 ("In highlighting counsel's duty to investigate [in Williams] . . . we applied the same 'clearly established' precedent of Strickland we apply today."). These cases are thus relevant only to the extent they might demonstrate that Anderson's counsel, confronted with circumstances like those presented at the time and place of Anderson's trial, failed to adhere to the standard of reasonable representation.

45

The ABA Guidelines do not establish independent standards for counsel; rather, they are merely guides to be considered in determining whether an attorney's conduct was reasonable. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("Prevailing norms as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."); see also Bobby v. Van Hook, 558 U.S. 4, 8–9, 130 S. Ct. 13, 17, 176 L. Ed. 2d 255 (2009) (rejecting the treatment of ABA Guidelines as "inexorable commands with which all capital defense counsel must fully comply"(internal quotation marks omitted)). The ABA Guidelines "can be useful as 'guides' to what reasonableness entails, but only to the extent that they describe the professional norms prevailing when the representation took place." Van Hook, 558 U.S. at 7, 130 S. Ct. at 16.

Strickland required that Anderson's attorneys make a reasonable investigation into "possible mitigating factors and ma[k]e a reasonable effort to present mitigating evidence to the sentencing court." Heynard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006); see also Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001). Our assessment of counsel's performance of this task is "highly deferential," Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007), and contains "'a strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" Chandler v. United States, 218 F.3d 1305,

1314 (11th Cir. 2000) (en banc) (quoting Strickland, 466 U.S. at 689–90, 104 S. Ct. at 2065–66).  We must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.

The "burden of establishing that [a] lawyer's deficient performance prejudiced [the petitioner's] case is also high."  Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002).  The petitioner cannot prevail simply by demonstrating that "the erro[r] had some conceivable effect on the outcome of the proceeding."  Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.  Rather, the petitioner must show a reasonable probability "that, absent the error[], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 695, 104 S. Ct. at 2069.  Only when this balancing produces "a probability sufficient to undermine confidence in the outcome" will relief be granted.  Id. at 694, 104 S. Ct. at 2068.

### B.

The first aspect of Anderson's ineffective assistance claim is that his attorneys were ineffective in failing to discover that, as a child, he had been sexually abuse by Michael Green and that Raymond Green could have testified to that fact.  He argues that the Florida Supreme Court unreasonably applied

47

Strickland's performance prong in rejecting this aspect of his claim. We disagree. We do so in large part because of Anderson's multiple denials of having been sexually abused. Newland, 527 F.3d at 1202 ("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."); see also Chandler, 218 F.3d at 1324 ("The reasonableness of a trial counsel's acts, including lack of investigation . . . , depends critically upon what information the client communicated to counsel." (internal quotation marks omitted)). "An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999); see also Heynard, 459 F.3d at 1245 ("Given [petitioner's] multiple denials of any history of sexual abuse and trial counsel's extensive and diligent efforts to build a mitigation case, the Florida Supreme Court's determination that counsel did not perform deficiently in this regard was neither 'contrary to,' nor 'an unreasonable application' of, United States Supreme Court precedent.").

Anderson not only failed to mention any instance of sexual abuse, he actively denied such abuse in his responses to the Questionnaire. Anderson does not dispute these explicit denials but argues that counsel were nonetheless deficient in failing to discover the abuse for two reasons—(1) they should not have left the Questionnaire with him and expected him to answer its questions privately,

48

without their assistance; and (2) they should have inquired further into the "red flags" contained in his answers to the questions. Pet'r's Br. at 30–32. We are not persuaded.

First, it was not unreasonable for counsel to assume that Anderson would be forthcoming and truthful in answering the questions presented. Counsel may well have believed that he would be more forthcoming if given time and space to answer the questions, free from the pressures of answering them verbally in their presence. As it turned out, Anderson's facially complete and thorough answers to the questions posed indicated that he indeed may have benefitted from having the time and space to respond. After reading his answers, his attorneys remarked that the answers were the most thorough and complete they had ever seen.

Second, Anderson suggests that his answers created "red flags" requiring counsel to inquire further into whether he had been abused as a child. He cites his answers to two specific sections of the Questionnaire: (1) in the section that asked how the deaths of any relative and friend he had listed affected him, Anderson included a description for every single person he had listed other than Michael Green; and (2) in the section that asked Anderson to underline problems he experienced as a child, he indicated that he experienced "Extreme Fears," was "Accident Prone," and got "Sick a Lot." Id. at 31–32. We see no "red flags" here.

49

Removing hindsight from our perspective, we consider how a reasonable attorney would have reacted to these answers—answers that appeared to be thorough, complete, and prepared by a person with every reason to be truthful. A reasonable attorney would not necessarily assume that Anderson's failure to describe the effect Michael Green's death had on him signaled that he was withholding evidence of a troubled relationship with Green. Similarly, his mention of the problems he encountered during childhood would not necessarily lead a reasonable attorney to assume that he was hiding a history of sexual abuse. See Puiatti v. Sec'y, Fla. Dep't of Corr., 732 F.3d 1255, 1285 (11th Cir. 2013) ("Trial counsel cannot be faulted for failing to link [the defendant's] history of drug abuse with an otherwise-undisclosed history of child abuse."). To the contrary, Anderson's forthcoming descriptions of the effect the deaths of other family members had on him and his admission that he experienced the childhood problems he mentioned would likely lead a reasonable attorney to believe that Anderson was not withholding any potentially mitigating circumstances.

Anderson attempts to paint his counsel's facially reasonable behavior as constitutionally deficient by pointing to the ABA guidelines in effect at the time of his trial and by analogizing his attorneys' conduct to the attorney conduct the Supreme Court faulted in Williams, Wiggins, Rompilla, and Porter. Anderson's brief makes no mention of how the standards governing counsel's performance in

50

those cases and set out in the ABA Guidelines compare to the standards of professional competence prevailing in Florida courts at the time of his trial. Instead, he implies that these four cases and the ABA Guidelines establish a national standard of professional competence in capital cases.

The Supreme Court has explicitly rejected such an implication. In <u>Van Hook</u>, the Court reversed the Sixth Circuit per curiam for erroneously substituting the ABA Guidelines for local, contemporaneous professional norms: "Restatements of professional standards, we have recognized, can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." 558 U.S. at 7, 130 S. Ct. at 16. In <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), the Court faulted the Ninth Circuit for reading <u>Williams</u>, <u>Wiggins</u>, and <u>Rompilla</u> as establishing a "constitutional duty to investigate" capital cases in a particular, prescribed way: "Beyond the general requirement of reasonableness, 'specific guidelines are not appropriate.'" <u>Id.</u> at __, 131 S. Ct. at 1406 (citations omitted).

In addition to failing to ground either the ABA Guidelines or the Supreme Court's holding in the four cases in a proper <u>Strickland</u> analysis, Anderson fails to account for the factual distinctions between the attorney behavior faulted in those sources and his attorneys' conduct in his case.

First, Anderson cites a portion of the Commentary for Guideline 11.4.2 of the 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.[56]  Pet'r's Br. at 30.  The relevant portion reads:

> One hurried interview with the client will not reveal to counsel all the facts counsel needs in order to prepare for a capital trial, appeal, or postconviction review . . . .  Any reluctance on the part of the client to disclose needed information must be overcome, not a quick or easy task.

Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases guideline 11.4.2 cmt. (1989), available at http://ambar.org/1989Guidelines.

 Anderson's attorneys went well beyond conducting "one hurried interview" in preparing for the penalty phase of the case.  In addition to having Anderson respond to the Questionnaire, they conducted several interviews with Anderson and a host of potential mitigation witnesses, retained Dr. McMahon to perform a psychological evaluation, and even utilized a psychologist specializing in hypnotism in an effort to uncover mitigating circumstances that might lead the jury to forego the death penalty.  This kind of professional behavior represents exactly the type of thorough investigation capital counsel should conduct.

---

[56] Guideline 11.4.2, which deals with client contact, provides as follows:

> Trial counsel should maintain close contact with the client throughout preparation of the case discussing . . . the investigation, potential legal issues that exist or develop, and the development of a defense theory.

Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases guideline 11.4.2 (1989), available at http://ambar.org/1989Guidelines.

Rompilla says nothing about situations—such as Anderson's—in which the defendant's denials prevent counsel from discovering mitigating evidence. Newland, 527 F.3d at 1205 ("In Rompilla the defendant's own contributions to any mitigation case were minimal, but this was irrelevant to the Court's decision on effectiveness." (internal quotation marks omitted)).  Rather, Rompilla focused on counsel's failure to examine a readily available file containing information about the defendant's prior conviction for rape and assault, despite knowing that the prosecution planned to use the prior conviction during the penalty phase as an aggravating factor.  545 U.S. at 383–84, 125 S. Ct. at 2463–64.  Anderson's argument that his attorneys failed to develop his trust so that he would be completely forthcoming in responding to the Questionnaire is not analogous to counsel's failure in Rompilla.  See Newland, 527 F.3d at 1206–07 ("[Counsel's] failure to investigate petitioner's childhood is not analogous to the defense lawyer's failure in Rompilla to review a readily available file, which the prosecution intended to use in aggravation.").

Williams says little about the standard of professional competence in capital cases.  There was no real dispute in that case that counsel had been ineffective: the same judge who sentenced Williams also found that counsel's performance had been deficient, Williams, 529 U.S. at 370, 120 S. Ct. at 1501, and the Virginia Supreme Court "assumed, without deciding, that trial counsel had been defective."

53

Id. at 371, 120 S. Ct. at 1501.  Williams was, instead, a case about the prejudice element of Strickland; the Virginia Supreme Court was held to have misinterpreted Lockhart v. Fretwell, 506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993), in dealing with Strickland's prejudice prong.  Williams, 529 U.S. at 391–95, 120 S. Ct. 1512–14.  In Anderson's case, the state courts found that counsel performed effectively, and we are asked to overturn this finding despite the deference we must accord it under AEDPA.  Williams gives us little guidance on this point.

Wiggins involved a situation where counsel failed to consider possible mitigation strategies despite being on notice of their existence.  Counsel received a one page description of the defendant's personal history included in the presentence report, which noted the defendant's "misery as a youth" and described his background as "disgusting."  Wiggins, 539 U.S. at 523, 123 S. Ct. at 2536 (internal quotation marks omitted).  The attorneys also had a record from the department of social services which revealed that the defendant's mother "was a chronic alcoholic," the defendant "was shuttled from foster home to foster home," and "on at least one occasion, [the defendant's] mother left him and his siblings alone for days without food."  Id. at 525, 123 S. Ct. at 2537.  Counsel failed to investigate these leads though "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses."  Id.  That is not the situation here.  First, the "red flags"

54

that Anderson points to above were a far cry from the explicit references to a troubled childhood in Wiggins. Moreover, Anderson's attempt to compare his own attorneys' conduct to the conduct at issue in Wiggins "overlooks a glaring difference" as "the evidence of abuse in . . . Wiggins was documented extensively in public records." Callahan v. Campbell, 427 F.3d 897, 935 (11th Cir. 2005). In Anderson's case, "there [were] no similar records of the defendant's abusive childhood." Newland, 527 F.3d at 1206.

Finally, Porter provides guidance for situations where counsel, confronted with a fatalistic and uncooperative client, conducts a truncated investigation and presents practically no mitigation evidence at sentencing. There, counsel became discouraged during the preparation of mitigation evidence because the client was "fatalistic and uncooperative." Porter, 558 U.S. at 40, 130 S. Ct. at 453. As a result, counsel "had only one short meeting with [the client ] regarding the penalty phase . . . [and] did not obtain any of [his] school, medical, or military service records . . . ." Id. at 39, 130 S. Ct. at 453. Because counsel ignored "pertinent avenues for investigation of which [counsel] should have been aware," the jury in sentencing "heard almost nothing that would humanize [the defendant] or allow them to accurately gauge his moral culpability." Id. at 40–41, 130 S. Ct. at 453–54. Here, Anderson's trial team conducted an extensive investigation in preparing for the guilt and penalty phases of the trial. Their efforts included the use of the

55

Questionnaire, multiple sessions with Anderson, attempted interviews with every potential mitigation witness, including all those identified by Anderson and his mother, and the hiring of an experienced forensic psychologist and a psychologist expert in hypnotism. In the penalty phase, his attorneys presented the testimony of ten separate mitigation witnesses, each of whom buttressed the humanization strategy the attorneys had chosen to pursue. Counsel's performance stands in stark contrast to the performance in Porter, where the Supreme Court found counsel deficient for failing "to conduct some sort of mitigation investigation." See id. at 40, 130 S. Ct. at 453 (emphasis in original).

Even if we were to assume that the Florida Supreme Court misapplied Strickland's performance prong in finding no deficiency in counsel's failure to uncover the Michael Green sexual abuse, we would still conclude that the Supreme Court did not err in denying this sexual abuse aspect of Anderson's ineffective assistance claim; for as the Supreme Court properly concluded, he failed to satisfy Strickland's prejudice prong. Although evidence of sexual abuse may constitute a mitigating circumstance, "[w]hen a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal." Callahan, 427 F.3d at 937. Assuming that the evidence of Anderson's sexual abuse was added to the mitigating evidence presented to the jury, it was not unreasonable for the Florida Supreme Court to conclude, after weighing the aggravating and mitigating

56

circumstances (including those developed on collateral attack) in the case, that Anderson failed to demonstrate a substantial probability that the sexual abuse evidence would have prompted the jury to recommend a sentence of life imprisonment instead of death.  The overwhelming evidence of Anderson's guilt further supports our holding.  Clisby v. Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994) ("[S]ometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder—or, even, a less brutal murder for which there is strong evidence of guilt in fact."); see also Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir. 2002) (partially grounding its finding of no prejudice in the "strength of the evidence both of [the defendant's] guilt and of the aggravating circumstances").

## C.

The second aspect of Anderson's ineffective assistance claim is that his attorneys should have provided Dr. McMahon with the time and background information she needed to conduct an adequate mental health evaluation.  Had they done this, Anderson contends, she would have discovered the sort of mitigating mental health evidence Drs. Villalba and Berland found.  In his brief, Anderson argues that attorneys' failure to present mitigating evidence like Drs. Villalba and Berland found fell below prevailing professional norms for two reasons: (1) a reasonable attorney would have retained Dr. McMahon earlier; and (2) a

reasonable attorney would have informed Dr. McMahon of Anderson's history of sexual abuse, drug use, and head trauma. The District Court concluded that the Florida Supreme Court properly applied Strickland in rejecting this argument.

Anderson's first point heavily emphasizes Dr. McClaren's statement that that mental health experts typically begin evaluating a capital defendant six months to a year before trial. Anderson contends that counsel's failure to conform to this common practice rendered Dr. McMahon unable to discover evidence of the Michael Green sexual abuse and of Anderson's psychological illnesses.

Anderson confuses a typical practice with a constitutional norm. Merely demonstrating that attorneys typically retain mental health experts six months to a year before trial does not demonstrate that the practice Dr. McClaren described is constitutionally required. Rather, Anderson had to show that attorneys typically retained mental health experts within the six-month to one-year time frame because a failure to do so would render a thorough and effective evaluation unlikely. He made no such showing. To the contrary, the record suggests that Anderson's attorneys gave Dr. McMahon adequate time to evaluate Anderson. She saw Anderson on four separate occasions for a total of thirteen hours and conducted a thorough neuropsychological screening. She also gave him a complete battery of psychological tests. In short, Dr. McMahon testified that she had adequate time to

fully evaluate Anderson. The Florida Supreme Court accepted her testimony, and had a sufficient basis in the record for doing so.

Anderson's second point is that counsel were constitutionally deficient in failing to inform Dr. McMahon of his extensive sexual abuse, drug use, and head injuries caused by car accidents—information Anderson provided Drs. Villalba and Berland. Assuming that the information was credible, the Florida Supreme Court's rejection of the Anderson's second point was nonetheless reasonable given Anderson's explicit denials of sexual abuse, drug use, and head injuries in answering the Questionnaire. See Stewart, 476 F.3d at 1211 ("The Constitution imposes no burden on counsel to scour a defendant's background for potential [mitigating evidence] given the defendant's contrary representations . . . .").

The Supreme Court's alternative holding—that counsel's failure to provide Dr. McMahon with the information Anderson provided Drs. Villalba and Berland did not render the outcome of the penalty phase constitutionally suspect—was also reasonable. Nothing in the record suggests that Dr. McMahon would have conducted a more thorough evaluation had she been given more time. Anderson does not quarrel with her examination of him or with the tests she chose to administer. Instead, he argues that if Dr. McMahon had begun evaluating him sooner "she would have been able to develop a rapport with him that would have led to the disclosure of the horrific sexual abuse [he] endured as a child." Pet'r's

Br. at 40.  This is nothing more than sheer speculation.  It falls far short of establishing a reasonable probability that Dr. McMahon would have uncovered any additional mitigation evidence, much less "that the balance of aggravating and mitigating circumstances did not warrant death."  Strickland, 466 U.S. at 695, 104 S. Ct. at 2069.

Dr. McMahon's testimony makes this clear.  At the evidentiary hearing, she testified that even assuming the credibility of Anderson's statements to Drs. Villalba and Berland about childhood sex abuse, head trauma, and severe drug and alcohol use, her opinion was that he did not have brain damage, borderline personality disorder, post-traumatic stress disorder, or any other mental health deficit that would explain his behavior in the bank, especially during the shooting. See Stewart, 476 F.3d at 1214 (finding no prejudice when the mental health expert retained by defense for trial and sentencing "testified in the state 3.850 hearing that information about [the defendant's] alleged abuse wouldn't have made any difference in his final opinion" (internal quotation marks omitted)).

## VI.

The District Court did not err in concluding that the Florida Supreme Court properly applied Strickland v. Washington in denying Anderson's ineffective assistance claim.  The judgment of the District Court denying Anderson a writ of habeas corpus is, accordingly,

60

AFFIRMED.

MARTIN, J., concurring in result only:

I agree with the Majority that the District Court is due to be affirmed on its denial of Mr. Anderson's claim that his trial counsel was ineffective for failing to conduct a reasonable mitigation investigation, and present an adequate mitigation case. I cannot, however, agree with all of the Majority's reasoning, so I write separately.

To begin, the Majority is certainly correct that the Florida Supreme Court's adjudication of Mr. Anderson's penalty phase ineffective assistance of counsel claim is entitled to deference under the Antiterrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254(d). At the same time, in order to succeed on a claim of ineffective assistance of counsel, a habeas petitioner must establish both deficient performance by his counsel, and that he was prejudiced by his counsel's deficient performance. Strickland v. Washington, 466 U.S. 668, 697, 104 S. Ct. 2052, 2069 (1984). Because Mr. Anderson did not establish the first required element, I would make no decision about the second. Specifically, I would affirm the District Court's denial of relief based on its finding that counsel was not deficient in his performance, and express no opinion about whether Mr. Anderson was prejudiced under the facts of this case. See id. ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same

62

order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

I do not share the Majority's confidence that the Florida Supreme Court reasonably applied the prejudice prong from Strickland within the meaning of 28 U.S.C. § 2254(d)(1). In particular, I have serious concerns about whether the Florida Supreme Court reweighed the totality of mitigating evidence against all the aggravating evidence, old and new. See Porter v. McCollum, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (holding, to assess prejudice in a capital sentencing proceeding, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation'" (alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515 (2000)). A proper reweighing of the evidence should have included both the positive character evidence presented at trial, as well as the sexual abuse and mental health evidence presented during the state postconviction proceedings.

My concerns are heightened here by the fact that the mitigating evidence that Mr. Anderson's counsel failed to discover (and present to the jury) includes evidence that Mr. Anderson was violently sexually abused for several years as a child. The evidence was also that Mr. Anderson developed post-traumatic stress disorder and other mental health issues as a result of this abuse. Mr. Anderson's

63

horrific history of child sexual abuse "is the kind of troubled history that the [Supreme] Court has 'declared relevant to assessing a defendant's moral culpability.'" Johnson v. Sec'y, DOC, 643 F.3d 907, 936 (11th Cir. 2011) (quoting Wiggins v. Smith, 539 U.S. 510, 535, 123 S. Ct. 2527, 2542 (2003)).

Neither do I agree with the Majority's categorical assertion that the remoteness of Mr. Anderson's sexual abuse diminishes its weight as mitigation. Mr. Anderson presented evidence in the state court postconviction proceedings that he developed post-traumatic stress disorder as a result of being the victim of violent and repeated sexual abuse. Also, this Court has recognized, albeit in a different context, the grave and enduring harm that sexual abuse of children inflicts on its victims:

> [T]he victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood. . . . Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

United States v. Irey,  612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (alteration in original) (quoting Kennedy v. Louisiana, 554 U.S. 407, 435, 128 S. Ct. 2641, 2658 (2008)).

Despite my reservations about the Majority's conclusion on prejudice, I do agree with the Majority's conclusion that the Florida Supreme Court's finding of

64

no deficient performance is entitled to deference. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 786 (2011) (quotation marks omitted). That said, I am troubled that trial counsel simply left a questionnaire with Mr. Anderson to fill out on his own, which inquired into sensitive aspects of his background that might be embarrassing, such as child sexual abuse. Child sex abuse victims often feel shame as a result of the abuse they suffered, and therefore may be hesitant to reveal it without a more sensitive inquiry. But while this method of investigation is not a method that should be encouraged for future cases, the Majority correctly sets out the ways in which counsel conducted a thorough background investigation and presented a substantial case for mitigation at Mr. Anderson's trial. Thus, the Florida Supreme Court's adjudication of counsel's performance was not objectively unreasonable.

65